UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| HEATHER STANCIL and MATTHEW SCHWARZ,<br>    Plaintiffs,<br>v.<br><br>JASON BARNES, STEPHEN SWANSON, DONALD KINNEY, and MIKAYLA GARSIDE, a/k/a MIKAYLA SIMPSON,<br>    Defendants. | No. 4:25-CV-242<br><br>FIRST AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

## Introduction

Madison County, Iowa is, in many ways, a prototypical Iowa community. The home of famous covered bridges that inspired a book and a movie, and the birthplace of an American cultural icon, it is otherwise quite ordinary. But recently, a very minor and very local political dispute has blossomed into a systematic abuse of governmental power. The county's two top law enforcement officials are on one side of a dispute about how to fill a vacancy in a county office. Not content to simply persuade their neighbors to share their views, those officials decided to abuse their offices to coerce and silence their political opponents. Because those actions violate the United States Constitution, this action is brought before the Court.

1

## Parties, Jurisdiction, and Venue

1. Heather Stancil is a resident of Madison County, Iowa. She serves as one of three members of the Madison County Board of Supervisors.

2. Matthew Schwarz is a resident of Madison County, Iowa. He is the current Madison County Auditor.

3. Defendant Jason Barnes is a resident of Madison County, Iowa. He serves as the Madison County Sheriff. He is sued in both his official and individual capacities.

4. Defendant Stephen Swanson is a resident of Madison County, Iowa. He serves as the Madison County Attorney. He is sued in both his official and individual capacities.

5. Defendant Donald Kinney is a resident of Madison County, Iowa. He is a Deputy Madison County Sheriff. He is sued in both his official and individual capacities.

6. Defendant Mikayla Garside, also known as Mikayla Simpson, is a resident of Warren County, Iowa. She is the elections deputy in the Office of the Madison County Auditor. She is sued in her official and individual capacities.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

8. Venue in this Court is appropriate under 28 U.S.C. § 1391 because the conduct giving rise to this action occurred in this judicial district and the defendants lives and has their principal places of business in this judicial district.

**Factual Background**

- *The resignation of the Madison County Auditor*

9. On or about May 6, 2025, Stancil and the other members of the Madison County Board of Supervisors were informed by Madison County Auditor Teri Kaczinski that she intended to resign her office effective July 4, 2025. Kaczinski had been elected to the office in the November 2024 general election and began her four-year term on January 1, 2025.

10. Under Iowa law, the Board of Supervisors is charged with the responsibility of filling a vacancy in the office of auditor. Iowa Code § 69.14A(2) gives the board two options. The board may appoint an individual to fill the vacancy, or the board may call for a special election to fill the office for the remaining balance of the unexpired term. If the board makes an appointment, the law provides for a 14-day period where eligible electors can petition to call for a special election to fill the vacancy.

- *Notice of the auditor vacancy is posted incorrectly before Schwarz is appointed*

11. The board voted on May 22, 2025, to fill Kaczinski's vacancy by appointment on July 7, 2025. Because Kaczinski had stopped coming in to work, the responsibility for publishing the official notice of the board's intention fell on Garside. Stancil had worked with the county's human resources staff person and Swanson to craft the posting about the board taking applications for the appointment for the auditor position. Garside did not ensure that a notice that complied with the requirement in Iowa Code § 69.14A(2)(a)(1) to include the advice to the public of its

3

right to petition for a special election was published. The notice about the job posting was posted on May 28. But even if this publication had included the notice about a petition process, it was too early, because Iowa Code § 331.305(1) requires the notice to be published not less than four nor more than 20 days before the board's proposed action. However, the board proposed an application and interview process that would take until late June. Garside and Swanson failed to alert anyone that the May 28 publication was not sufficient to allow the board to move ahead with an appointment. As county attorney, Swanson's official duties include giving legal advice to the county's officers and employees about the performance of their official duties.

12. On July 3, 2025, Stancil and one other member of the board voted to appoint Matthew Schwarz to the office of Madison County Auditor. On advice of county attorney Swanson, Schwarz did not take the oath of office until the following Monday, July 7, 2025. Schwarz qualified for office on that date by taking the prescribed oath. Schwarz took possession of the books, records, and office space of the Madison County Auditor immediately thereafter.

- *Concern about unbudgeted special election expenses*

13. If a special election is held, either because the board chooses one or eligible electors successfully petition for one, the county is responsible for paying for the costs to conduct the special election.

14. Madison County, like most Iowa counties, budgets for anticipated election expenses but does not ordinarily plan for special election expenses during

the fiscal year, because those expenses are, by definition, generally not anticipated. The board has the ultimate responsibility under Iowa law for the county's budget. The board is required to ensure that expenditures during a given fiscal year do not exceed the amount that has been specified in the county's official budget adopted after notice to the public and a hearing. The board had not budgeted to conduct a special election for the position of auditor.

15. When the board considered the appropriate process to fill the anticipated vacancy in the position of auditor, Stancil publicly advocated for filling the vacancy by appointment because that method would not cause unnecessary and unbudgeted expenses to Madison County taxpayers.

16. Several Madison County residents used the social media site Facebook to express their disagreement with the board's decision to fill the vacancy by appointment rather than a special election and with the choice of Schwarz. Stancil, as is her normal practice as an elected official, used Facebook to express her views on the decision.

17. Throughout her service as a supervisor, Stancil had consistently expressed the view that it was her responsibility to be a good steward of taxpayer dollars. Consistent with this view, in a statement on Facebook responding to a comment calling for a special election, Stancil explained that if the board was required to expend funds for a special election because of a successful petition, "I will then work to find ways to offset that additional cost to taxpayers by shrinking government."

- *Efforts to fix the defective May 28 notice*

18.  On July 13, 2025, Stancil requested guidance from the county attorney about the defects in the May 28 notice. Swanson replied the next day that since the language was left off the board should repost the notice. He said "[t]heoretically someone could challenge based on improper notice."

19.  On July 14, 2025, Schwarz also emailed the county attorney requesting advice on how to address the problems in the May 28 notice. He proposed republishing the notice and having the board redo the appointment. He and the county attorney exchanged emails about the subject. The county attorney told Schwarz that "the best idea to solve the issue would be is to just reissue the announcement with the language that the citizens would have 14 days from the date of the new announcement to gather signatures if they want to petition for a special election, but that any signatures gathered from July 7 to the 14 days after the new announcement would be considered valid for the purposes of the special election."

20.  The county attorney's email prompted Schwarz to point out that the board voted to appoint him on July 3, not July 7. This was important for determining when the 14-day period to petition for a special election would run. The county attorney replied, "It was pending her resignation on the 4th so it could not be on the 3rd. I believe the real appointment date to be the 7th as that is when it was officially put into place." Schwarz discussed in his office the timing issue of the petition with Garside and that he had been discussing the issue with the county attorney to get the date determination correct. Garside told Schwarz she supported reposting the notice of appointment to ensure that it was done correctly.

- *The Sheriff issues a press release about a preposterous voter intimidation investigation*

21. In response to Stancil's statement that unexpected expenditures must be paid for with offsetting cuts, Barnes issued a press release on or about July 14, 2025, that his office "is fully aware of a recent online public statement allegedly made by a member of the Madison County Board of Supervisors. The statement is in regard to a petition being sought by some residents of Madison County who are seeking a special election to choose their County Auditor." The release further stated that "[a]nyone who signs a petition or chooses not to sign it will do it without fear of an adversarial response by anyone or any group that opposes or supports the petition."

22. The press release identified the Facebook comment described above as a violation of Iowa Code § 39A.2. The release further stated that Stancil's Facebook comment and a preliminary investigation were forwarded to the Iowa Attorney General's Office as required by Iowa law.

23. Whatever preliminary investigation Barnes conducted, it did not include even an attempt to discuss the matter with Stancil. Stancil learned about the sheriff's actions when she was contacted by a reporter who had received Barnes' press release.

24. Barnes' press release was widely reported in central Iowa news media. Television station WHO-13 carried a story on its internet site titled, "Sheriff: Madison County Supervisor Chairwoman now under investigation for alleged

election misconduct."[1] Similarly, television station KCCI carried a story titled "Madison County supervisor under investigation for election misconduct, voter intimidation."[2] Both stories repeated the framing of Barnes' press release: that Stancil's comment about county budgeting constituted a criminal offense.

25.   Iowa Code § 39A.2 defines the offense of election misconduct in the first degree, a class "D" felony punishable by imprisonment for a term not to exceed five years and a fine of between $1,025 and $10,245. To commit a violation of Iowa Code § 39A.2, the individual must have acted willfully. This means the prosecution would be required to prove the person acted intentionally or by fixed design or purpose to violate the law. Iowa Code § 39A.2(c)(3) includes a criminal offense for anyone who "intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, a person to do or to refrain from doing any of the following…[t]o sign a petition nominated a candidate for public office or a petition requesting an election for which a petition may legally be submitted."

26.   No reasonable law enforcement officer could find an elected official's statement about offsetting unexpected expenses for a special election to constitute an act that "intimidates, threatens, or coerces," or attempts to do so, a person from signing a petition to request a special election. Barnes' claim about the meaning of Iowa Code § 39A.2 would criminalize everything that elected officials regularly do. Any action by an elected official could ultimately be connected to a claim it was done

---

[1] https://who13.com/news/sheriff-madison-county-supervisor-chairwoman-now-under-investigation-for-alleged-election-misconduct/
[2] https://www.kcci.com/article/heather-stancil-madison-county-supervisor-under-investigation-for-election-misconduct-voter-intimidation/65403283

to influence the public's participation in elections. *This is the fundamental principle of democracy*. Taking a statute designed to prevent, for example, standing in front of a polling place and threatening violence to those who attempt to enter, and applying it to a public official stressing the importance of balanced budgets is preposterous. There is no probable cause to believe that Stancil's statement constituted a violation of Iowa Code § 39A.2.

27. The explanation in Barnes' press release of his duty to investigate election misconduct got it backwards. The Iowa Attorney General has exclusive prosecution authority over violations of Iowa Code Chapter 39A. Iowa Code § 13.11. If an allegation of a violation of that chapter is reported to the attorney general, it is the duty of the county sheriff to investigate. Iowa Code § 39A.7. "Upon the completion of an investigation required this section, the county sheriff…shall submit the results of the investigation, including the report from the law enforcement agency, to the attorney general and the state commissioner, and the attorney general shall explain whether the attorney general will pursue charges. Any information that is requested by or in the possession of the state commissioner pursuant to this chapter remains a confidential record pursuant to section 22.7, subsection 5." Id.

28. Thus, under Iowa law, the attorney general directs a county sheriff to investigate and report back to her office and the state commissioner of elections. The law also exempts the report from the sheriff's general obligation to release the "date, time, specific location, and immediate facts and circumstances surrounding a crime or incident" notwithstanding the general confidentiality of peace officers' investigative reports. Iowa Code § 22.7(5).

29. Barnes ignored his statutory obligation to investigate allegations of election misconduct at the direction of the attorney general and to ensure the confidentiality of any resulting report.

30. Barnes' retaliation against Stancil by making a criminal referral and publicly stating he had done so was motivated by animus because of Barnes' political alignment with individuals in Madison County who are in favor of holding a special election for the auditor vacancy and who have been generally opposed to the recent decisions of the board. Swanson and Garside are similarly aligned politically in the Madison County community.

31. Barnes' making of the criminal referral to the attorney general and the public statement of having done so was objectively unreasonable conduct when viewed from the perspective of a reasonable law enforcement officer.

32. Barnes' conduct was done with callous and reckless indifference to Stancil's constitutional rights.

33. Stancil responded to Barnes' abuse of her constitutional rights by filing a Complaint with this Court under 42 U.S.C. § 1983. Her complaint was filed at 12:45 p.m. on July 16, 2025. News of the filing was picked up by several media sources about two hours later.

- *Fixing the May 28 notice's issues by reposting the notice of intent to fill vacancy*

34. Because county attorney Swanson had given legal advice that the errors in the May 28 notice needed to be corrected, Schwarz and Stancil decided to follow this advice by causing a new posting to be published.

35. The new notice was published in the Winterset newspaper on July 16, 2025. A copy of it appeared on the board's website and was included in the packet for the upcoming July 22, 2025, meeting. This notice indicated the board would take a vote on appointing an auditor at that July 22 meeting and included the required information about the public's right to petition for a special election. Because this notice was published within the 4-and-20-day required period, it complied with Iowa Code § 331.305.

36. The potential that the board would take a new vote on July 22, 2025, to appoint Schwarz created a significant problem for the individuals behind the petition drive. Because when a signature on a petition "is dated prior to the date on which the appointment was made" is not valid, the signatures that had been gathered to date would be ineffective. The promoters of a special election would have to start over gathering signatures.

37. Schwarz and Stancil were also considering when a special election might take place if the petition drive was successful. Schwarz knew the 32-day minimum interval before the election could be held created an administrative problem for him as Auditor. Garside, his employee responsible for elections matters, was scheduled to depart for a two-week vacation on August 27, 2025. Because Schwarz, as a new auditor, had not yet supervised an election, he wanted to have his employee with experience available to work. But he was also sensitive to the appearances of delaying the special election because of the Code's instruction to hold it at the "earliest practicable date."

- *Swanson, Barnes, and Garside kick Schwarz out of office*

38. Just after 4:00 p.m. on July 16, and less than four hours after Stancil had sued the sheriff, Swanson emailed Schwarz and demanded that he immediately vacate the courthouse. Swanson told Schwarz his office was vacant and that Schwarz could not be present. Swanson indicated to Stancil that Schwarz would be "trespassed" from the courthouse if he did not leave. Stancil understood this to mean the sheriff would arrest Schwarz. Schwarz left the courthouse. Garside was present for this incident and indicated to other auditor's office employees that she was aware that Schwarz would be removed beforehand.

39. Iowa law gives the board of supervisors, not the county attorney, the authority to declare an office vacant. Swanson's action removing Schwarz from the courthouse on threat of arrest by the sheriff was illegal.

- *Defendants orchestrate the issuance of search warrants by presenting materially false information to a state judge*

40. On July 18, 2025, Kinney applied for identical search warrants from Iowa District Court Judge Thomas Murphy. The warrants sought authorization to search Schwarz and Stancil and seize "[a]ny cellular or electronic devices capable of sending or receiving messages electronically through cellular, Wi-Fi, or other digital or analog transmission, including but not limited to cellular telephones such as iPhones, Androids, or google Pixel phones, tablets such as iPads, Android based tablets, or any computers, in the possession or under control of the above listed person."

41. Kinney's identical warrant applications relied on two witnesses: Barnes and Garside. The applications indicate that Swanson was involved in connecting Garside with Barnes to provide information in support of the warrant applications. The crux of the applications was the claim that Schwarz and Stancil were seeking to change the date of Schwarz's appointment to frustrate the gathering of signatures to seek a special election.

42. Judge Murphy granted both search warrant applications. Copies of the warrant applications, and the executed warrants are attached as Exhibits 1 and 2 to this First Amended Complaint.

43. Kinney executed the warrant for Stancil at her residence at around 6:50 p.m. on Friday, July 18, 2025. He seized Stancil's personal cell phone. He also seized her county-owned laptop.

44. Kinney executed the warrant for Schwarz at his residence at around 7:15 p.m. on Friday, July 18, 2025. He seized Schwarz's personal cell phone.

45. Counsel for Schwarz and Stancil moved to quash the warrants. Iowa District Court Judge Dustria Relph presided over a hearing on the motion on July 31, 2025. The Iowa Attorney General's Office appeared on behalf of the State of Iowa at the hearing.

46. Judge Relph granted the motion to quash the search warrants. She found that the search warrants were improperly endorsed by Judge Murphy because he did not make a finding of the credibility of the confidential informant relied upon in the warrant applications.

47. Judge Relph further found that the warrants failed to specify what offense was claimed to be the basis of the probable cause determination. The warrant applications recited that law enforcement was investigating "Election Misconduct," yet the chapter of the Iowa Code with that title lists dozens of wildly different offenses. Judge Relph criticized the conclusory nature of the warrant applications. Judge Relph ruled the warrants lacked probable cause.

48. Judge Relph further found that the warrants were likely based on material misstatements of material facts in that they omitted the role that Swanson and Garside had played in the discussion of the mistakes in the May 28 notice, and in particular that they had omitted the fact that Swanson had advised his clients Schwarz and Stancil to repost the notice of vacancy for the auditor position—the very act that would potentially change the 14-day period when signatures could be gathered to force a special election.

49. In other words, county attorney Swanson and auditor employee Garside willfully misled Judge Murphy about the events that had led to the reposting of the notice of vacancy. Swanson failed to ensure that Judge Murphy was aware that the warrant application was based on election administration decisions made by Schwarz and Stancil that he had advised them to take.

50. Judge Relph held that the material misstatements of fact by these omissions met the threshold under *Franks* v. *Delaware*, 438 U.S. 154, 171 (1978). During the July 31 hearing, the two Assistant Iowa Attorneys General present for the hearing stated they did not know what evidence they could provide that would correct this omission and were not prepared to go forward with a fact showing in

response to the court's finding. Judge Relph stated that she would quash the warrants because of the lack of the informant's endorsement and the lack of probable cause on the face of the warrant applications and did not make an ultimate finding on the *Franks* issue because of the prosecution's statement it was not ready to proceed with evidence.

51. Judge Relph ordered the personal property seized by Kinney returned immediately. The Madison County Sheriff's Office turned over the property shortly after the conclusion of the July 31, 2025, hearing.

### Count I – Retaliation in Violation of Rights Protected under the First and Fourteenth Amendments to the U.S. Constitution
### (Stancil v. Barnes)

52. The Civil Rights Act of 1871, later codified at 42 U.S.C. § 1983, and as interpreted by the U.S. Supreme Court, provides that persons acting under color of state law "shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings" for the "deprivation of any rights, privileges, or immunities secured by the Constitution."

53. The Fourteenth Amendment to the Constitution incorporates the rights under the First Amendment to engage in speech and to petition the government for redress of grievances. "The framers designed the Free Speech Clause of the First Amendment to protect the freedom to think as you will and to speak as you think." *303 Creative LLC* v. *Elenis*, 600 U.S. 570, 584 (2023) (cleaned up).

54. Stancil, as both a citizen and an elected official, has a right protected by the First Amendment to communicate her views on policy matters without fear of sanction from the government. *Wood* v. *Georgia*, 370 U.S. 375, 395 (1962) ("The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.")

55. An individual has the right to be free from retaliation for her exercise of her First Amendment rights of speech and petition of the government. *Garcia* v. *City of Trenton*, 348 F.3d 726, 728-29 (8th Cir.). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions for speaking out." *Hartman* v. *Moore*, 547 U.S. 250, 256 (2006) (citations omitted). "If there is any fixed star in our constitutional constellation it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *303 Creative LLC*, 600 U.S. at 585 (cleaned up).

56. Retaliation for engaging in protected speech is actionable when it will chill a person of ordinary firmness in the plaintiff's position from engaging in future First Amendment activity or when it otherwise adversely affects the plaintiff's protected speech. *Houston Comm. Coll. Sys.* v. *Wilson*, 595 U.S. 468, 477-78 (2022).

57. Barnes' retaliatory actions caused injury to Stancil including, but not limited to, loss of standing in the community and emotional injury.

58. Barnes' retaliatory actions were a direct result of Stancil engaging in protected activities and were a substantial and motivating factor in Barnes' retaliatory actions. Barnes' retaliatory actions would chill a person of ordinary

firmness from engaging in or from continuing to engage in speech and petition rights protected under the Constitution.

**Count II - Retaliation in Violation of Rights Protected under the First and Fourteenth Amendments to the U.S. Constitution**
**(All Plaintiffs v. All Defendants)**

59.   Paragraphs 1-58 are repleaded as set forth above.

60.   The application for and execution of the search warrants against Schwarz and Stancil were done by the Defendants in retaliation for Schwarz and Stancil's rights of speech, association, and petition as protected by the First and Fourteenth Amendments to the U.S. Constitution. The actions of the Defendants would chill a person of ordinary firmness from engaging in or from continuing to engage in speech, association, and petition rights protected under the Constitution.

**Count III – Violation of Rights Protected under the Fourth and Fourteenth Amendments to the U.S. Constitution**
**(All Plaintiffs v. All Defendants)**

61.   Paragraphs 1-60 are repleaded as set forth above.

62.   The Fourteenth Amendment to the Constitution incorporates the rights under the Fourth Amendment to be free from unreasonable searches and seizures.

63.   This Fourth Amendment right includes the clearly established right to freedom from government officials obtaining a search warrant with an application that contains materially false statements or omissions knowingly or recklessly made

in conscious disregard for the truth. *Estate of Nash* v. *Folsom*, 92 F.4th 746 (8th Cir. 2024).

64. Schwarz and Stancil were each harmed by the invasion of their personal privacy and the seizure of their property under the pretense of a search warrant that had been obtained in violation of the Fourth Amendment because it lacked probable cause, and it was obtained by presenting materially false statements and omissions knowingly and recklessly made in conscious disregard for the truth.

65. The Defendants each participated in and caused the issuance of the search warrants by presenting materially false statements and omissions knowingly and recklessly made in conscious disregard for the truth.

## Conclusion

66. As a result of Defendants' actions, the Court should award to each Plaintiff compensatory and punitive damages, injunctive relief, court costs, attorney fees, and such other relief as allowed by law.

67. Plaintiffs demand jury trial for these claims.

Respectfully submitted,

/s/ Alan R. Ostergren
**Alan R. Ostergren**
Alan R. Ostergren, PC
500 East Court, Suite 420
Des Moines, Iowa 50309
(515) 207-0134
alan.ostergren@ostergrenlaw.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned certifies that a true copy of the FIRST AMENDED COMPLAINT was served upon all parties through the courts CM/ECF electronic filing system on August 4, 2025.

/s/ Alan R. Ostergren