IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| HEATHER STANCIL and MATTHEW T. SCHWARZ,<br><br>Plaintiffs,<br><br>vs.<br><br>JASON BARNES, STEPHEN SWANSON, DONALD KINNEY, and MIKAYLA GARSIDE,<br><br>Defendants. | 4:25-cv-00242-SHL-HCA<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |

## I.     INTRODUCTION.

This action arises from bridges burning in Madison County, figuratively. In the weeks following the resignation of the County Auditor, local officials got into a public dispute about how her replacement should be appointed. This culminated with County Sheriff Jason Barnes referring County Board of Supervisors Member Heather Stancil to the Iowa Attorney General's Office for a criminal investigation and obtaining a search warrant for electronic devices belonging to Stancil and the putative replacement County Auditor, Matthew T. Schwarz. Stancil and Schwarz now bring claims pursuant to 42 U.S.C. § 1983 against Barnes, Deputy Sheriff Donald Kinney, County Attorney Stephen Swanson, and county employee Mikayla Garside for allegedly violating their First, Fourth, and Fourteenth Amendment rights. Defendants move to dismiss. (ECF 16.) For reasons explained below, all claims against Swanson and Garside will be dismissed, along with Schwarz's First Amendment retaliation claim against Barnes and Kinney. The remaining claims will proceed. Accordingly, the Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

## II.     BACKGROUND.

*A. Facts.*

On a motion to dismiss, the Court accepts as true the well-pleaded facts in the First Amended Complaint. This action arises from a dispute between county officials in Madison County, Iowa. (ECF 11, ¶¶ 1–5.) Stancil is a member of the Madison County Board of Supervisors. (Id., ¶ 1.) Schwarz was appointed by the Board of Supervisors ("the Board") to the role of County Auditor in early July 2025. (Id., ¶¶ 2, 12.) The validity of Schwarz's appointment and his right to

1

occupy the office was disputed and is at the center of this action. (Id., ¶¶ 2, 11–20, 34–39.) Barnes is the Madison County Sheriff. (Id., ¶ 3.) Kinney is a Madison County Deputy Sheriff. (Id., ¶ 5.) Swanson is the Madison County Attorney. (Id., ¶ 4.) Garside is the elections deputy in the Office of the Madison County Auditor. (Id., ¶ 6.)

In May 2025, then-Madison County Auditor Teri Kaczinski gave notice to the Board that she intended to resign her office effective July 4, 2025. (Id., ¶ 9.) Under Iowa Code § 69.14A(2), the Board is empowered to address the vacancy either by appointment or through a special election. (Id., ¶ 10); Iowa Code § 69.14(2). If the board chooses to make an appointment, voters have fourteen days to override this decision and require the holding of a special election. (ECF 11, ¶ 10); Iowa Code § 69.14A(2)(a)(2). If the petition is successful, the Board's appointment is temporary, and a special election is called to fill the seat on a permanent basis. (ECF 11, ¶ 10); Iowa Code § 69.14A(2)(a)(2). To facilitate this process, Iowa Code § 69.14A(2)(a)(1) requires the Board to publish notice of their intent to fill the position by appointment and notify the public of the right to petition for a special election. (ECF 11, ¶ 11.)

On May 22, 2025, the Board voted to fill the County Auditor vacancy via appointment effective July 7, 2025. (Id.) The Board published notice of the appointment but failed to say anything about the right of the public to petition for a special election, as required by the statute. (Id.) The Board did not recognize the error, nor did any other officials, such as Garside or Swanson, alert them to it. (Id.) On July 3, 2025, the Board, including Stancil, formally voted to appoint Schwarz as the Madison County Auditor. (Id.) This action was taken four days earlier than the public notice had indicated. (Id., ¶ 12.) On the advice of Swanson, Schwarz was sworn in on July 7—after Kaczinski's resignation took effect. (Id., ¶¶ 9, 12.)

Shortly after Schwarz's appointment, "[s]everal Madison County residents" began to express their disagreement on Facebook with the Board's appointment of Schwarz in lieu of a special election. (Id., ¶ 16.) Stancil opposed a special election because "the county is responsible for paying the costs of a special election" and the county "does not ordinarily plan for special election expenses." (Id.) She posted a message to this effect on her official Facebook account, stating that if there was a special election due to a successful petition, she would "then work to find ways to offset that additional cost to taxpayers by shrinking government." (Id., ¶ 17.) Stancil routinely posted her views on this Facebook account as a "normal practice" in her role as "an elected official." (Id.)

2

On July 14, Sheriff Barnes issued a press release stating that his office was "fully aware of a recent online public statement allegedly made by a member of the Madison County Board of Supervisors. The statement is in regard to a petition being sought by some residents of Madison County who are seeking a special election to choose their County Auditor." (Id., ¶ 21.) Barnes's press release suggested that Stancil's Facebook comment violated Iowa Code 39A.2, which prohibits attempted or actual intimidation, threats, or coercion related to a "petition nominating a candidate for public office or a petition requesting an election for which a petition may be legally submitted." (Id., ¶¶ 22–25.) A violation of § 39A.2 is a class D felony. (Id., ¶ 25.) Barnes's press release stated that Stancil's Facebook post and a preliminary investigation had been forwarded to the Iowa Attorney General for further investigation. (Id., ¶ 22.) Central Iowa media outlets reported on Barnes's press release. (Id., ¶ 24.) Plaintiffs dispute Barnes's putative interpretation of § 39A.2, asserting that no reasonable law enforcement officer could have interpreted Stancil's statements as having violated the statute. (Id., ¶ 26.) Plaintiffs further assert that Barnes's press release misstated how potential violations under § 39A.2 are to be investigated. (Id., ¶¶ 27–29.)

In the period immediately following Schwarz's appointment in early July 2025, he and Stancil began to look into whether the May 28 notice was defective. (Id., ¶¶ 18–19.) On July 13, Stancil requested guidance from Swanson, who said that "[t]heoretically someone could challenge based on improper notice." (Id.) The following day, Schwarz and Swanson discussed "republishing the notice and having the board redo the appointment." (Id.) While Swanson felt that republishing the notice was the "best idea to solve the issue," it would create a different problem by invalidating the signatures that had been gathered from members of the public as part of the petition for a special election. (Id., ¶ 36.) This is because signatures that are dated prior to the appointment are invalid. (Id.) To avoid this problem, Swanson recommended that the Board:

> reissue the announcement with the language that the citizens would have 14 days from the date of the new announcement to gather signatures if they want to petition for a special election, but that any signatures gathered from July 7 to the 14 days after the new announcement would be considered valid for the purposes of the special election.

(Id., ¶ 19.) Schwarz and Swanson also discussed whether July 3 or July 7 should be treated as the start date for the fourteen-day period for collecting signatures. (Id., ¶ 20.) Schwarz believed the operative date should be July 3—the date of the Board vote—but Swanson pointed out that the vote was "pending [Kaczinski's] resignation on the 4th so it could not be on the 3rd. I believe the

real appointment date to be the 7th as that is when it was officially put into place." (Id.) In conversations with Schwarz, Garside "supported reposting the notice of appointment to ensure it was done correctly." (Id.) Following Swanson's advice, the Board published a new notice in the Winterset newspaper on July 16. (Id., ¶¶ 34–35.) The new notice corrected several errors from the first notice, including notifying the public of the right to petition for a special election. (Id.) The new appointment was set for July 22. (Id.)

After the new notice was published on July 16, "Swanson emailed Schwarz and demanded that he immediately vacate the courthouse" because "his office was vacant." (Id., ¶ 38.) Swanson suggested that he would have Schwarz arrested if he did not leave. (Id.) Schwarz left the courthouse. (Id.) Garside "was present for this incident and indicated to other auditor's office employees that she was aware that Schwarz would be removed beforehand." (Id.)

On July 18, 2025, Kinney filed an application for search warrants for Schwarz's and Stancil's electronic devices. (Id., ¶ 40; ECF 11-1, pp. 3–4; ECF 11-2, pp. 3–4.) Kinney's affidavit stated that a confidential informant "reported to Sheriff Barnes that he/she had been directed by both Stancil and Schwarz to alter appointment dates, deadlines and invalidate petition signatures for a special election." (ECF 11-1, pp. 3–4; ECF 11-2, pp. 3–4.) Text messages from the confidential source were attached to both warrant applications. (ECF 11-1, pp. 5–6; ECF 11-2, pp. 5–6.) In context, it seems clear that Garside was the confidential source. In addition, both warrant applications also included the following statement by Barnes:

> On July 17, 2025, I received a call from Madison County Attorney Stephen Swanson informing me that Madison County Elections Deputy Mikayla Garside wanted to talk to me. Swanson then forwarded me her number. . . . Garside stated that Madison County Supervisor Heather Stancil and Madison County Auditor Matthew Schwarz were pressuring her into delaying or derailing a special election that residents of Madison County are attempting to get. Both Stancil and Schwarz are desperately trying to alter appointment dates and deadlines for the petition to delay the election per Garside. Stancil informed Garside that she'll need more time to campaign for Schwarz and the deadlines set by the state will not allow her enough time to door knock. At one time Stancil stated to Garside "Do what you have to do" regarding pushing the election back.

(ECF 11-1, p. 10; ECF 11-2, p. 10.) Iowa District Court Judge Thomas P. Murphy issued warrants for electronic devices for Stancil and Schwarz. (ECF 11-1, p. 8; ECF 11-2, p. 8.) Kinney executed the warrants on the evening of July 18, seizing Stancil's personal cell phone and county laptop and Schwarz's personal cell phone. (ECF 11, ¶¶ 43–44.)

4

Stancil and Schwarz challenged the validity of the July 18 warrants in state court. (Id., ¶ 45.) On July 31, the parties participated in a hearing before Iowa District Court Judge Dustria Relph. (Id.) Two Iowa Assistant Attorneys General were present, too. (Id.) Judge Relph found that the warrants were deficient on several grounds. (Id.) First, the "search warrants were improperly endorsed by Judge Murphy because he did not make a finding of credibility of the confidential informant relied upon in the warrant applications." (Id., ¶ 46.) Next, they "failed to specify what offense was claimed to be the basis of the probable cause determination" in that the warrant cited "Election Misconduct" but did not identify which offense was being investigated under Iowa Code Chapter 39A. (Id., ¶ 47.) Judge Relph also said the warrants were "likely based on material misstatements of material fact in that they omitted the role that Swanson and Garside had played in the discussions of the mistakes in the May 28 notice." (Id., ¶ 48.) Plaintiffs allege that Judge Relph held that the material misstatements of fact resulting from these omissions "met the threshold" under *Franks v. Delaware*, 438 U.S. 154, 171 (1978). (Id., ¶ 50.) It is unclear whether the words "met the threshold" mean that Judge Relph concluded false statements or material omissions had been made, or if she merely meant that there needed to be an evidentiary hearing. Either way, the Assistant Attorneys General "were not prepared to go forward with a fact showing in response to the court's finding." (Id.) Judge Relph did not make an ultimate finding of the *Franks* issue, instead concluding the warrants were invalid because of "the lack of the informant's endorsement and the lack of probable cause on the face of the warrant applications." (Id.) Judge Relph ordered the return of the property to Stancil and Schwarz. (Id., ¶ 51.) The Sheriff's Office complied. (Id.)

B. Procedural History.

On August 4, 2025, Stancil and Schwarz filed their First Amended Complaint. (ECF 11.) They bring three § 1983 claims against Defendants in their personal and official capacities. (Id., ¶¶ 2–7.) In Count I, Stancil brings a claim against Barnes for retaliation in violation of her First and Fourteenth Amendment rights based on Barnes making a criminal referral and issuing a press release in response to her Facebook post about the costs of a special election. (Id., ¶¶ 52–58.) In Count II, Stancil and Schwarz allege First Amendment retaliation against all Defendants based on their participation in the application for and execution of the search warrants for electronic devices. (Id., ¶¶ 59–60.) In Count III, Stancil and Schwarz bring a Fourth Amendment claim against all Defendants based on the putative absence of probable cause and the use of false and misleading

statements to obtain the warrants. (Id., ¶¶ 61–65.) Plaintiffs seek compensatory damages, punitive damages, injunctive relief, court costs, and attorney fees. (Id., ¶ 66.) Defendants move to dismiss all claims. (ECF 16.)

## III. LEGAL STANDARDS.

### A. Motion to Dismiss Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court need not accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

### B. First Amendment Retaliation.

"The First Amendment prohibits laws 'abridging the freedom of speech.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting U.S. Const. amend. I). Thus, "'[a]s a general matter,' the First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Id.* (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). "To prevail on their retaliation claim, the plaintiffs must show that 'they engaged in protected [First Amendment] activity.'" *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023) (alteration in original) (quoting *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 837 (8th Cir. 2021)). "If they can make that showing, then the focus shifts to whether the officers 'took [an] adverse action . . . that would chill a person of ordinary firmness from continuing in the [protected] activity.'" *Id.* (alterations in original) (quoting *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017)). Finally, the plaintiffs must prove the officers "would not have taken the adverse action but for harboring 'retaliatory animus' against the plaintiff[s] because of [the] exercise of [their] First Amendment rights." *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) (quoting *Nieves*, 587 U.S. at 398).

*C. False Statements and Material Omissions in Search Warrant Affidavits.*

Search warrants must be supported by probable cause to be valid under the Fourth Amendment. *See United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022). Supporting affidavits establish probable cause when they "set[] forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States v. Lindsey*, 43 F.4th 843, 848 (8th Cir. 2022) (quotation omitted). This requires a "nexus . . . between the item to be seized and criminal behavior." *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967)). The question is not "hypertechnical" and relies more on "common sense." *United States v. O'Dell*, 766 F.3d 870, 873–74 (8th Cir. 2014) (per curiam) (quotation omitted). It is determined by "considering the totality of the circumstances," and courts give "great deference" to the issuing judge's resolution of the question. *United States v. Hansel*, 524 F.3d 841, 845 (8th Cir. 2008) (citations omitted); *see also United States v. Montgomery*, 527 F.3d 682, 686 (8th Cir. 2008) (determination stands unless it lacks a "substantial basis").

"Where an issuing judge's probable cause determination was premised on an affidavit containing false or omitted statements, the resulting search warrant may be invalid . . . ." *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). To show the search warrant is invalid, the defendant must prove, by a preponderance of the evidence, "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading . . . and (2) that the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Id.* (citation omitted).

**IV.   LEGAL ANALYSIS.**

Defendants' Motion to Dismiss raises four arguments: (i) Count I fails as a matter of law because Stancil's Facebook posts are not protected by the First Amendment; (ii) Count II fails as a matter of law against all Defendants because Stancil and Schwarz did not engage in activity protected by the First Amendment; (iii) Counts II and III fails as a matter of law as against Garside because she was not "acting under color of state law" when she served as an informant in connection with the search warrant application; and (iv) Counts II and III fail as a matter of law as against Swanson because he did not participate in any meaningful way in the application for or execution of search warrants. These arguments will be addressed in turn.

7

### A. The Motion to Dismiss Is DENIED as to Count I.

Barnes argues that Count I should be dismissed because Stancil's speech is not protected by the First Amendment. This is a very narrow argument that focuses solely on the scope of Stancil's First Amendment rights and not on whether Barnes is entitled to qualified immunity or some other form of protection from Stancil's claims.

Barnes argues that Stancil is not entitled to First Amendment protection because she was speaking in her official capacity when she made the Facebook post that led to Barnes's responsive Facebook post and criminal referral. (ECF 28, pp. 1–2.) He asks the Court to apply the *Pickering-Garcetti* test, which arises out of cases in which adverse employment action was taken against public employees based on speech that the employees argued was protected by the First Amendment. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968). *Garcetti* holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421; *see also Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) ("When making a statement pursuant to his official duties, a public employee is not speaking as a citizen.").

Barnes's argument misunderstands the *Pickering-Garcetti* test. The purpose of the test is to determine when the First Amendment protects public employees from adverse employment action based on their speech. In *Pickering* itself, for example, a schoolteacher was fired for writing a letter to a local newspaper criticizing the school board and superintendent for how they handled bond proposals and allocated financial resources. 391 U.S. at 566. The letter did not "in any way either impede[] the teacher's proper performance of his daily duties in the classroom or [] interfere[] with the regular operation of the schools generally." *Id.* at 572–73. *Pickering* held that because the schoolteacher was speaking as a private citizen on a matter of public concern, he was protected from termination by the First Amendment unless the employer could show that he knowingly or recklessly made false statements. *Id.* at 574.

By contrast, in *Garcetti*, the plaintiff, a deputy district attorney, made statements within the scope of his job duties about the perceived inaccuracy of a search warrant affidavit. 547 U.S. at 414. He shared his concerns with his supervisor and recommended dismissal of the underlying criminal case, leading to a heated meeting with the warrant affiant and representatives from the sheriff's department. *Id.* The supervisor ended up rejecting the plaintiff's recommendation to

8

dismiss the criminal case. *Id.* The plaintiff alleged that he then began experiencing adverse employment action. *Id.* at 415. *Garcetti* held that the First Amendment did not protect the plaintiff from these adverse employment actions because his speech arose as part of the performance of his job duties and not as a private citizen. *Id.* at 421–22. He therefore did not have a viable claim for First Amendment retaliation. *Id.* at 426.

The *Pickering-Garcetti* test does not apply here. Stancil is not a public employee who was subject to discipline or termination by her employer based on her speech. Instead, she is an elected official speaking on political issues. "None of the Supreme Court's public employee speech decisions qualifies or limits the First Amendment's protection of elected government officials' speech." *Rangra v. Brown*, 566 F.3d 515, 523 (5th Cir. 2009), *rev'd on mootness grounds*, 584 F.3d 206 (5th Cir. 2009). This is because "the manifest function of the First Amendment requires that legislators [and other elected officials] be given the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966); *see also Jenevein v. Willing*, 493 F.3d 551, 557–58 (5th Cir. 2007) ("[P]olitical speech [is] at the core of the First Amendment . . . .") In other words, "it wouldn't make sense for *Pickering/Garcetti* to govern elected officeholders." *Schermerhorn v. County of McHenry*, 766 F. Supp. 3d 790, 794 (N.D. Ill. 2025); *accord Werkheiser v. Pocono Township*, 780 F.3d 172, 177–81 (3d Cir. 2015) ("[I]f *Garcetti* applied to elected officials, speaking on political issues would appear to be part of an elected official's 'official duties,' and therefore unprotected. But protection of such speech is the 'manifest function' of the First Amendment." (citation omitted)).

One reasonably might ask why Barnes's own speech in *his* Facebook post is not entitled to First Amendment protection, too. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (recognizing that elected officials generally should not be held liable under § 1983 for "alleged retaliatory acts . . . in the form of speech"). Indeed, "[e]ven charges of criminal conduct against an official or candidate are constitutionally protected unless they are made with knowledge of their falsehood or with reckless disregard of whether they are false or not." *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999). Barnes has not, however, raised this issue in his Motion to Dismiss, nor has he raised any of the other defenses that typically arise in § 1983 cases, such as qualified immunity. He also does not address the second and third elements of a First Amendment retaliation claim, which are whether the state actor "took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity" and whether the adverse

action "was motivated at least in part by the exercise of the protected activity." *Wolk v. City of Brooklyn Center*, 107 F.4th 854, 859–60 (8th Cir. 2024). This ruling therefore should not be understood as expressing any view on those issues. Instead, it simply addresses the very narrow issue of whether Stancil's speech is protected by the First Amendment. Because it is so protected, Barnes's Motion to Dismiss is DENIED as to Count I.

### B. The Motion to Dismiss Is GRANTED IN PART and DENIED IN PART as to Counts II and III.

#### 1. Count II Alleges First Amendment Speech by Stancil But Not by Schwarz.

In Count II, Defendants again rely on *Pickering-Garcetti* to argue that Stancil has failed to allege that she engaged in speech protected by the First Amendment. Because the *Pickering-Garcetti* test does not apply to Stancil, this narrow argument fails as to her.

Defendants separately argue that Schwarz does not have a viable claim in Count II because "the First Amended Complaint does not allege any speech by him at all." (ECF 16-1, p. 11.) In response, Schwarz asserts that he engaged in "speech" in the sense that he "was aligned with Stancil as a political supporter of his and was busy communicating with the public about his duties." (ECF 21, p. 6.) The First Amended Complaint itself does not make these allegations, much less assert that they were the reason for Defendants' alleged acts of retaliation. Instead, the overwhelming focus of the First Amended Complaint is on *Stancil's* speech, including, especially, her Facebook post. Schwarz cannot bring a First Amendment retaliation claim based on someone else's speech. *See, e.g.*, *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 662–63 (9th Cir. 2000) (holding that plaintiff could not pursue First Amendment claim based on someone else's speech even when the speech was wrongly attributed to her); *cf. Hodak v. City of St. Peters*, 535 F.3d 899, 905–06 (8th Cir. 2008) (holding that plaintiff lacked standing to pursue retaliation claim arising out of someone else's speech). The Court therefore GRANTS the Motion to Dismiss as to Schwarz's claims in Count II.

#### 2. Counts II and III Will Be Dismissed as to Garside.

Garside argues that she is not liable for First Amendment retaliation as alleged in Count II or for violating Plaintiffs' Fourth Amendment rights as alleged in Count III because she had no authority under state law to take any action in violation of Plaintiffs' constitutional rights. Instead, she simply reported perceived misconduct to Barnes and Kinney. She therefore argues that she was not acting "under color of state law" for purposes of 42 U.S.C. § 1983. The Court agrees.

10

As a starting point, the First Amended Complaint alleges that Garside had the role of "elections deputy" in the County Auditor's Office. (ECF 11, ¶ 6.) Even when all reasonable inferences are drawn in Plaintiffs' favor, there is nothing about this role to suggest that Garside had any authority over Stancil. To the contrary, as a Board member, *Stancil* had authority over *Garside*. It is difficult to imagine a scenario in which a lower-ranking government official could engage in First Amendment retaliation against a higher-ranking official. *See Houlihan v. Sussex Tech. Sch. Dist.*, 461 F. Supp. 2d 252, 261 (D. Del. 2006) ("Generally, to act under the color of state law, the alleged wrongdoer must occupy a supervisory position over the plaintiff.").

To that end, it is important to recognize that "abuse of official power" is the touchstone of a § 1983 claim. *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449 (1st Cir. 1997). "[I]t is not enough for an individual merely to purport to exercise official power in order to trigger § 1983 liability, but rather the individual must actually be engaged in the abuse of official power granted by the government." *Id.*; *see also Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014) ("A public employee acts under color of law when he exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." (cleaned up)). Here, because Garside has no authority over Stancil, she cannot have abused that authority to retaliate against Stancil. Simply put, "one cannot misuse power one does not possess." *Wilson v. Price*, 624 F.3d 389, 393–95 (7th Cir. 2010) (affirming dismissal of § 1983 claim against state elected official where alleged constitutional violations occurred outside the scope of his authority); *see also Criswell v. City of O'Fallon*, No. 4:06-cv-01565, 2007 WL 1760744, at *4 (E.D. Mo. June 15, 2007) (holding that plaintiff failed to state First Amendment retaliation claim against city officials who lacked authority to take adverse action against him). Garside therefore cannot be liable under § 1983 for First Amendment retaliation.

Granted, as Plaintiffs correctly point out, § 1983 sometimes imposes liability on a state actor who engages in "joint action" with others to violate a plaintiff's constitutional rights. (ECF 21, p. 10.) The problem for Plaintiffs here, however, is that the First Amended Complaint does not allege Garside's involvement in any way that could trigger personal liability under § 1983 under a joint action theory. For example, the First Amended Complaint does not allege that Garside, in her subordinate role in the County Auditor's elections deputy, played any part in Barnes's Facebook post and criminal referral. *See Davis v. City of Little Rock*, 122 F.4th 326, 331 (8th Cir. 2024) (affirming dismissal of § 1983 claim based on plaintiff's failure to show defendant's personal

involvement). Similarly, although Garside was allegedly present when Schwarz was removed from his office under threat of arrest, it is not plausible that she had any authority with respect to these events; at most, she was a mere bystander. *Cf. Robinson v. Payton*, 791 F.43d 824, 829 (8th Cir. 2015) (recognizing that officers may be liable for failing to intervene only when they know a constitutional violation is occurring and have "both the opportunity and the means to prevent the harm from occurring" (citation omitted)).

This leaves only Garside's involvement in the search warrant application. Plaintiffs argue that she provided "false and misleading information" to Barnes or Kinney, who then reported the same information to the state court judge in the search warrant affidavit. (ECF 21, p. 9.) Garside is not, however, a law enforcement officer, nor does the First Amended Complaint allege that her job as elections deputy gives her the authority to open criminal investigations or apply for search warrants. *See Mackey v. Rising*, 106 F.4th 552, 562 (6th Cir. 2024) (affirming dismissal of § 1983 claims against elected official who made threats of force against plaintiff because the official had no authority to use force under state law). Accordingly, her involvement in the search warrant application process is not "state action" for purposes of § 1983, whether under a "joint action" theory or otherwise. *See Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) ("Logically, then, not every action undertaken by a person who happens to be a state actor is attributable to the state.").

It does not matter that Garside learned the information she reported to Kinney or Barnes by virtue of her position as a government employee. A government employee who lacks general law enforcement powers is not a "state actor" when reporting potential illegal activity to a law enforcement agency even if the employee only learns of the potential illegality by virtue of his or her position. For example, in *Hughes v. Meyer*, 880 F.2d 967, 968–69 (7th Cir. 1989), a game warden reported to the local sheriff's department that he had been falsely imprisoned by two brothers while investigating potential illegal hunting. The brothers alleged that the report was false and therefore brought claims against the warden and others pursuant to § 1983. *Id.* at 971. The Seventh Circuit affirmed the dismissal of the § 1983 claims against the warden, holding that his "acts of describing his encounter with the [] brothers was functionally equivalent to that of any private citizen reporting to the police the details of an alleged criminal act." *Id.* at 972. "His status as a DNR official did not clothe him with greater authority to make statements to the police about the occurrence than any other citizen would possess." *Id.* The same logic applies to Garside's report

to Kinney about her interactions with Stancil and Schwarz. Although these interactions emanated from her position as elections deputy, she had no greater authority to report criminal activity in that position than any other citizen would possess. *See id.*; *see also Waters*, 242 F.3d at 359 (holding that elected official did not act "under color of state law" when he sought law enforcement's assistance in locating someone because members of the public can do the same).

Counts II and III are especially weak from a "joint action" standpoint when one looks closely at what Garside is alleged to have done in connection with the search warrant application. The First Amended Complaint admits that Stancil and Schwarz had discussions with Garside about the deficiencies in the original notice of the County Auditor vacancy, the timing of a substitute notice, and how the issuance of a substitute notice might impact the validity of signatures gathered by local residents hoping to force a special election. Accordingly, most of what Garside reported to Barnes and/or Kinney was rooted in facts, with Plaintiffs simply disputing the legal significance of those facts and noting that the affidavit should have mentioned Garside's own role in preparing the original notice. To the extent there is a Fourth Amendment violation here at all, Garside was not acting as a "state actor" when she contributed to it. *See Hughes*, 880 F.2d at 972; *Sroga v. Hondzinski*, No. 16 C 5796, 2017 WL 3278916, at *4 (N.D. Ill. Aug. 2, 2017) (dismissing § 1983 claim against city sanitation workers who towed vehicle despite allegedly not having probable cause that it had been stolen; "the Department of Streets and Sanitation does not train its workers to determine the probability that a crime has occurred or that they are faced with evidence of it. Such is the province of police officers, not Streets and Sanitation employees"). The Court therefore GRANTS the Motion to Dismiss as to Counts II and III against Garside.

3. Counts II and III Will Be Dismissed as to Swanson.

As with Garside, Plaintiffs do not allege that Swanson participated in Barnes's Facebook post or the criminal referral of Stancil to the Attorney General's Office. Instead, the § 1983 claims against him revolve entirely around his involvement in the search warrant applications. The First Amended Complaint fails, however, to allege anything more than scattered facts as to Swanson, most of which have no material significance to the alleged Fourth Amendment violations. For example, although Swanson allegedly participated in the removal of Schwarz from his office, this had nothing to do with the warrant application and therefore is not a Fourth Amendment violation. Similarly, although Swanson allegedly communicated with county officials about problems with the original notice regarding the County Attorney vacancy, none of the allegations accuse him of

13

doing anything wrong in connection with those communications. Indeed, some of those communications were with Stancil and Schwarz themselves. Thus, again, these allegations are essentially irrelevant to the eventual warrant application.

Swanson's only alleged involvement in the warrant application occurred when he helped Garside connect with Barnes. (Id., ¶ 41.) This does not mean that he knew what Garside was going to say to Barnes, much less what Barnes would end up including (or *not* including) in the warrant affidavit. Indeed, although each warrant application contains a space for the county attorney's signature if it "has been reviewed . . . for legal sufficiency" (ECF 11-1, p. 3; ECF 11-2, p. 3), the signature lines are conspicuously blank here. Meaning: It does not appear that Barnes ever reviewed the warrant applications. Plaintiffs have not done enough in these circumstances to allege Swanson's "personal involvement" in the alleged violations of their constitutional rights in connection with the warrant applications. *See Davis*, 122 F.4th at 331.

In urging the Court to conclude otherwise, Plaintiffs argue that the extent of Swanson's involvement in the search warrant application process is "a disputed fact that cannot be resolved in a 12(b)(6) motion." (ECF 21, pp. 10–11.) This argument fails because Plaintiffs bear the burden under Fed. R. Civ. P. 12(b)(6) to plead "sufficient factual matter" to state a viable claim for relief. *Rydholm*, 44 F.4th at 1108. They have not done so here.

## V. CONCLUSION.

Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Garside and Swanson are dismissed from the case. Count II is dismissed as to Schwarz. The following claims will proceed:

- Stancil: Count I against Barnes; Count II against Barnes and Kinney; Count III against Barnes and Kinney.

- Schwarz: Count III against Barnes and Kinney.

**IT IS SO ORDERED.**

Dated March 9, 2026.

_____
Stephen H. Locher
UNITED STATES DISTRICT JUDGE